**John Eric PRICE, Petitioner–Appellant,**

v.

**UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, Respondent–Appellee.**

**No. 89–16457.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 14, 1991.

Decided Aug. 7, 1991.

Withdrawn April 20, 1992.

Order and Opinion Filed April 20, 1992.

---

Pillsbury Madison & Sutro, Walter R. Allan, Edward V. Anderson, Barbara R. Shufro, Michael F. La Bianca, San Jose, Cal., ACLU of Northern California, Edward Chen, San Francisco, Cal., Kai H. Wessels, Law Offices of Kai H. Wessels, San Jose, Cal., for petitioner-appellant.

Lowell V. Sturgill, Jr., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before BEEZER and NOONAN, Circuit Judges and JAMES K. SINGLETON,* District Judge.

## ORDER

The full court has been advised of the suggestion for rehearing en banc. Judge

Beezer rejected the suggestion for rehearing en banc and Judge Singleton recommended rejection. Judge Noonan approved the suggestion for rehearing en banc. An active judge called for a vote on the suggestion and a majority of active judges voted not to rehear the matter en banc. The panel resumed control of the case February 25, 1992.

The panel has unanimously voted to grant the petition for rehearing. The opinion filed August 7, 1991, 941 F.2d 878, is withdrawn. A new opinion is filed herewith and the clerk shall issue the mandate forthwith.

## OPINION

BEEZER, Circuit Judge:

John Eric Price appeals the district court's denial of his petition for naturalization. The district court's order was based on Price's refusal to list all organizations with which he has ever been affiliated. Price argues that the Attorney General does not have statutory authority to require him to supply such a list and that such authority would be unconstitutional. We affirm.

I

John Price is a native of England and a citizen of the United Kingdom. He was granted lawful resident alien status in the United States in 1960, and has worked and resided in the United States since then.

On April 21, 1984, Price applied to petition for naturalization. Price answered all questions on the application except Question 18, which reads: "List your present and past membership in or affiliation with every organization, association, fund, foundation, party, club, society or similar group in the United States or in any other country or place, and your foreign military service. (If none, write 'None.')." In the space provided for an answer to this question, Price wrote "Please see attached statement."

* The Honorable James K. Singleton, United States District Judge for the District of Alaska, sitting by designation.

The attached statement is a legal brief contending that Question 18 violates Price's First Amendment right of association.

Price answered negatively all parts of Question 19, which asked whether he was or had ever been a member of or associated with the Communist Party, had ever knowingly aided or supported it, or had ever "advocated, taught, believed in, or knowingly supported or furthered the interests of Communism." Additionally, during the course of a preliminary examination before a designated naturalization examiner, Price swore:

I am not and have not been, within the meaning of the Immigration and Nationality Act, for a period of at least 10 years immediately preceding the date of this petition, a member of or affiliated with any organization proscribed by such Act, or any section, subsidiary, branch, affiliate or subdivision thereof, nor have I

during such period believed in, advocated, engaged in, or performed any of the acts or activities prohibited by such Act.

At a Further Preliminary Examination, Price, under oath, reaffirmed his answer to Question 19. When the examiner read the text of Question 18 to him, Price responded that he had not had any foreign military service. He also admitted that he had been a member of "any organization," but he refused to answer any further questions on the subject on the ground that they were "overbroad" and violated his constitutional rights.[1] Price later swore that he was not consciously thinking of any professional or social organization knowledge of which he intended to keep from the INS.

Price also was given a copy of section 313 of the Immigration and Naturalization Act, 8 U.S.C. § 1424(a), which describes organizations and activities in which participation will bar an alien from being naturalized,[2] and swore that he was not and had

---

1. Price refused to answer the following questions:

Are you now or have you ever been a member, or are you now affiliated, or have you ever been affiliated with any organization, association, fund, foundation, party, club, society or similar group in the United States or in any other country or place?

. . . . .

Are you now, or have you ever been, in the United States, a member of any organization in the United States?

. . . . .

Have you ever been a member of any organizations outside the United States?

. . . . .

Have you been a member of a political organization in the United States?

. . . . .

Were you ever a member, outside the United States, of any organization that ... is or was political?

. . . . .

Are you now or have you ever been a member of any association, fund, foundation, party, club, society or any similar groups?

. . . . .

Have you ever been affiliated with any organization, political or nonpolitical, in the United States?

2. Section 313, 8 U.S.C. § 1424(a) (1988), provides:

... [N]o person shall hereafter be naturalized as a citizen of the United States—

(1) who advocates or teaches, or who is a member of or affiliated with any organization that advocates or teaches, opposition to all organized government; or

(2) who is a member of or affiliated with (A) the Communist Party of the United States; (B) any other totalitarian party of the United States; (C) the Communist Political Association; (D) the Communist or other totalitarian party of any State of the United States, of any foreign state, or of any political or geographical subdivision of any foreign state; (E) any section, subsidiary, branch, affiliate, or subdivision of any such association or party; (F) the direct predecessors or successors of any such association or party, regardless of what name such group or organization may have used, may now bear, or may hereafter adopt; (G) who, regardless of whether he is within any of the other provisions of this section, is a member of or affiliated with any Communist-action organization during the time it is registered or required to be registered under the provisions of section 786 of Title 50; or (H) who, regardless of whether he is within any of the other provisions of this section, is a member of or affiliated with any Communist-front organization during the time it is registered or required to be registered under section 786 or Title 50, unless such alien establishes that he did not have knowledge or reason to believe at the time he became a member of or affiliated with such an organization ... that such organization was a Communist-front organization; or

(3) who, although not within any of the other provisions of this section, advocates the

never been a member of or affiliated with any organization mentioned in that section and reaffirmed the averment made at the first preliminary examination.

On the basis of his refusal to answer Question 18, the district court denied Price's petition for naturalization on the INS's recommendation. On appeal, Price argues that Question 18 exceeds the statutory authority granted the Attorney General by Congress, and that the question violates his First Amendment right to freedom of association.

## II

In order to be naturalized, a petitioner must have been a lawfully admitted permanent resident alien, *id.* § 1429 (1988), who has resided in the United States for at least five years prior to the filing of the naturalization petition and for the time between the filing of his petition and his admission to citizenship, and must have been physically present for at least half of that time. *Id.* § 1427(a)(1), (2). He must also have been "a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States" for five years before the filing of the petition and up to the time of admission to citizenship. *Id.* § 1427(a)(3). Finally, he must not fall into any of the categories described in section 1424(a). *See supra* note 2.

■ The Immigration and Naturalization Act gives the Attorney General the authority to "prescribe the scope and nature of the examination of petitioners for naturalization as to their admissibility to citizenship." 8 U.S.C. § 1443(a) (1988). The examination of petitioners must be limited to

> inquiry concerning the applicant's residence, physical presence in the United States, good moral character, understanding of and attachment to the fundamental principles of the Constitution of the United States, ability to read, write and speak English, and other qualifications to become a naturalized citizen as required by law.

*Id.* § 1443(a). Within these limits, the Attorney General has the authority to require an applicant for naturalization to aver to *"all facts which* in the opinion of the Attorney General *may be material to the appli-*

economic, international, and governmental doctrines of world communism or the establishment in the United States or a totalitarian dictatorship, or who is a member of or affiliated with any organization that advocates the economic, international, and governmental doctrines or world communism or the establishment in the United States of a totalitarian dictatorship, either through its own utterances or through any written or printed publications issued or published by or with the permission or consent of or under authority of such organization or paid for by the funds of such organization; or

(4) who advocates or teaches or who is a member of or affiliated with any organization that advocates or teaches (A) the overthrow by force or violence or other unconstitutional means of the Government of the United States or of all forms of law; or (B) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers ... of the Government of the United States or of any other organized government because or his or their official character; or (C) the unlawful damage, injury, or destruction of property; or (D) sabotage; or

(5) who writes or publishes or causes to be written or published, or who knowingly circulates, distributes, prints, or displays, or knowingly causes to be circulated, distributed, printed, published, or displayed, or who knowingly has in his possession for the purpose of circulation, publication, distribution, or display, any written or printed matter, advocating or teaching opposition to all organized government, or advocating (A) the overthrow by force, violence, or other unconstitutional means of the Government of the United States or of all forms of law; or (B) the duty, necessity, or propriety of the unlawful assaulting or killing of any officer or officers ... of the Government of the united States or of any other organized government, because of his or their official character; or (C) the unlawful damage, injury, or destruction of property; or (D) sabotage; or (E) the economic, international, and governmental doctrines of world communism or the establishment in the United States of a totalitarian dictatorship; or

(6) who is a member of or affiliated with any organization that writes, circulates, distributes, prints, publishes, or displays, or causes to be written, circulated, distributed, printed, published, or displayed, or that has in its possession for the purpose of circulation, distribution, publication, issue, or display, any written or printed matter of the character described in subparagraph (5) of this subsection.

*cant's naturalization," id.* § 1446(a) (emphasis added), and to designate INS employees to take "testimony concerning *any matter touching or in any way affecting* the admissibility of any petitioner for naturalization." *Id.* § 1446(b) (emphasis added). Thus the Attorney General is given very broad authority to make inquiries as long as they are related in some way to the naturalization requirements.

Price contends that by listing in section 1424(a) certain types of organizations whose alien members or affiliates are barred from naturalization, Congress implicitly prohibited the Attorney General from denying naturalization on the basis of association with any other organizations. Therefore, he argues, the broad authority granted the Attorney General to inquire into any matter "touching or in any way affecting" admissibility does not include inquiry into any other types of organizations. There is, however, no legislative history either supporting or undermining the assumption that section 1424(a) is intended to be an exclusive list.

The INS argues that limiting examination to asking petitioners whether they are members of organizations of the type described in section 1424(a) requires the INS to rely on petitioners' own determinations whether particular organizations are of the prohibited type, rather than allowing the Service to make that determination, and does not address the possibility that a petitioner may wrongly believe that an organization with which he is affiliated does not fall within section 1424(a).

Although section 1424(a) does not appear to require knowledge on the part of the petitioner that the organization is of the type described, we need not resolve that issue here.[3] In at least one circumstance, Congress explicitly gave the Attorney General the responsibility of determining whether a given organization falls within section 1424(a). Section 1424(a)(2)(H) provides that no alien may be naturalized who is a member of or affiliated with any Communist-front organization ... unless such alien establishes that he did not have knowledge *or reason to believe* at the time he became a member of or affiliated with such an organization ... that such organization was a Communist-front organization.

*Id.* § 1424(a)(2)(H) (emphasis added). A petitioner who does not know he is a member of a Communist-front organization would not list that organization in responding to questions regarding 1424(a)-type organizations. However, only by examining all organizations with which the petitioner is affiliated can the Attorney General determine whether the petitioner had "reason to believe" the organization is or was a Communist-front.

The INS also argues that membership in types of organizations not described in section 1424(a) may be relevant to other requirements of naturalization such as duration of residence, good moral character or being "well disposed to the good order and happiness of the United States." "The government is entitled to know of any facts that may bear on an applicant's statutory eligibility for citizenship, so it may pursue leads and make further investigation if doubts are raised." *Berenyi v. District Director, INS*, 385 U.S. 630, 638, 87 S.Ct. 666, 671, 17 L.Ed.2d 656 (1967). It is completely reasonable to assume that knowing the organizations with which a petitioner is associated will be relevant to one or more of the requirements for citizenship. Furthermore, because "INS officials must exercise especially sensitive political functions that implicate questions of foreign relations, ... the reasons for giving deference to agency decisions ... in other administrative contexts apply with even greater force in the INS context." *INS v. Abudu*, 485 U.S. 94, 110, 108 S.Ct. 904, 915, 99 L.Ed.2d 90 (1988) (footnotes omitted) (affirming the Board of Immigration Appeals' denial of a motion to reopen deportation hearings). Question 18 does not ex-

---

**3.** "Meaningful association" with the organization in question has been required in the deportation context, *see Gastelum–Quinones v. Kennedy*, 374 U.S. 469, 477, 83 S.Ct. 1819, 1823, 10 L.Ed.2d 1013 (1963), and in the context of petitions for adjustment of status. *See Firestone v. Howerton*, 671 F.2d 317 (9th Cir.1982).

ceed the broad authority given the Attorney General to implement the naturalization statutes.

### III

"[A]n alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982). However, "once an alien gains admission to our country and begins to develop ties that go with permanent residence, his constitutional status changes accordingly." *Id.* It has long been recognized that resident aliens enjoy the protections of the First Amendment. *See Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 477 n. 5, 97 L.Ed. 576 (1953) (quoting *Bridges v. Wixon*, 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103 (1945) (Murphy, J., concurring)); *Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 309 n. 5, 90 S.Ct. 1731, 1734 n. 5, 26 L.Ed.2d 252 (1970) (same quotation); *United States v. Verdugo–Urquidez*, 856 F.2d 1214, 1222 (9th Cir.1988), *rev'd on other grounds*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990).

However, the protection afforded resident aliens may be limited. The Supreme Court recently stated that the cases establishing constitutional protection for aliens within the territory of the United States "are constitutional decisions of this Court expressly according differing protection to aliens than to citizens, based on our conclusion that the particular provisions in question were not intended to extend to aliens in the same degree as to citizens." *United States v. Verdugo–Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 1064, 1065, 108 L.Ed.2d 222 (1990) (citations omitted). Additionally, the Court has historically afforded Congress great deference in the area of immigration and naturalization.

> Over no conceivable subject is the legislative power of Congress more complete than it is over the admission of aliens.... Our cases have long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.... [S]ince decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary, and [t]he reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization.

*Fiallo v. Bell*, 430 U.S. 787, 792, 796, 97 S.Ct. 1473, 1477, 1480, 52 L.Ed.2d 50 (1977) (quotations omitted). "[I]n the exercise of its broad power over immigration and naturalization, 'Congress regularly makes rules that would be unacceptable if applied to citizens.'" *Id.* at 792, 97 S.Ct. at 1478 (quoting *Mathews v. Diaz*, 426 U.S. 67, 80, 96 S.Ct. 1883, 1891, 48 L.Ed.2d 478 (1976)).[4]

---

4. Commentators have noted that "to say that Congress has all the immigration power it could be granted is not to say that the exercise of the power is free of limits established elsewhere in the Constitution.... [T]he immigration power does not stand above or before the Constitution.... Accordingly, immigration regulations ought to be subject to the judicial scrutiny accorded other exercises of federal power." *See* Aleinikoff, *Federal Regulation of Aliens and the Constitution*, 83 Am.J.Int'l L. 862, 866 (1989); *see also Carlson v. Landon*, 342 U.S. 524, 537, 72 S.Ct. 525, 532, 96 L.Ed. 547 (1952) ("The power to expel aliens ... is, of course, subject to judicial intervention under the 'paramount law of

the Constitution.'"). However, the Supreme Court has recognized that it is not

> "writing on a clean slate.... As to the extent of the power of Congress under review, there is not merely 'a page of history' ... but a whole volume. Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process.... But that the formulation of these policies is entrusted exclusively to Congress has become about as firmly embedded in the legislative and judicial tis-

The INS relies on *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972) for the proposition that Price's first amendment rights invoke at most only limited judicial review. In *Kleindienst*, the INS denied a nonimmigrant visa to a Belgian author on the basis of his Marxist writings. Several U.S. citizen scholars argued that this decision violated their first amendment rights to receive information and ideas. *Id.* at 760, 92 S.Ct. at 2580. The Court agreed that first amendment rights of citizens were implicated, *id.* at 765, 92 S.Ct. at 2582, but held that

> when the executive exercises this [exclusion] power negatively on the basis of a *facially legitimate and bona fide reason*, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant.

*Id.* at 770, 92 S.Ct. at 2585 (emphasis added).

■ Price argues that because *Kleindienst* involved exclusion rather than naturalization, it does not control his case. However, the determination of who will become a citizen of the United States is at least as "peculiarly concerned with the political conduct of government," *Galvan v. Press*, 347 U.S. 522, 531, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954), as the decision of who will be allowed to enter, if not more so. While a resident alien may not participate in the process of governing the country, naturalized citizens may. Naturalization decisions, therefore, deserve at least as much judicial deference as do decisions about initial admission.[5] Furthermore, al-

though Price is justified in expecting the greatest degree of constitutional protection afforded a non-citizen,[6] the protection afforded him under the First Amendment certainly is not greater than that of the citizen plaintiffs in *Kleindienst*. For these reasons, the *Kleindienst* standard is appropriate in this case.

■ Price argues that he is not challenging the political decision underlying the determination of the substantive requirements for naturalization, but that he challenges instead the method of inquiry, which, in the case of Question 18, chills his freedom of association. Because of this posture, he contends, greater judicial scrutiny is appropriate.

A similar claim was rejected in *Kleindienst*. Congress had authorized the Attorney General to waive the ineligibility of aliens for temporary admission where appropriate " 'for humane reasons and for reasons of public interest.' " 408 U.S. at 767, 92 S.Ct. at 2584 (citation omitted). The citizen plaintiffs argued that the implementation of the Attorney General's decision "must be limited by [their] First Amendment rights." *Id.* The Court applied only limited judicial scrutiny and held that the requirements of the First Amendment were met because the reasons for refusing to grant the waiver were "facially legitimate and bona fide." *Id.* at 769, 92 S.Ct. at 2585.

■ Applying this limited standard of review to the Attorney General's decision to ask Question 18 is also appropriate because "[n]o alien has the slightest right to naturalization unless all statutory require-

---

sues of our body politic as any aspect of our government."
*Fiallo*, 430 U.S. at 792–93 n. 4, 97 S.Ct. at 1478 n. 4 (quoting *Galvan v. Press*, 347 U.S. 522, 530–32, 74 S.Ct. 737, 742–43, 98 L.Ed. 911 (1954)).

5. The importance of the naturalization process was the basis for the district court's alternative holding that even under a more demanding First Amendment analysis, the government has a compelling interest in asking questions such as Question 18 that outweighs any First Amendment right a petitioner for naturalization may have.

6. An alien is

> accorded a generous and ascending scale of rights as he increases his identity with our society. Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.

*Johnson v. Eisentrager*, 339 U.S. 763, 771, 70 S.Ct. 936, 940, 94 L.Ed. 1255 (1950); *see also Verdugo–Urquidez*, 110 S.Ct. at 1063.

ments are complied with." *See Fedorenko v. United States,* 449 U.S. 490, 506, 101 S.Ct. 737, 747, 66 L.Ed.2d 686 (1981). Additionally, "the burden is on the applicant to show his eligibility in every respect." *See Berenyi,* 385 U.S. at 637, 87 S.Ct. at 671.[7]

Price looks for support to *Girouard v. United States,* 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946), in which the Supreme Court overruled existing precedent and held that the statutory requirement that a petitioner for naturalization swear his willingness to "support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic" could not be read to require a petitioner to swear to "take up arms in defense of this country." The Court noted that Congress had traditionally shown great deference to First Amendment principles in defining the scope of the phrase "support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic." *Id.* at 68–69, 66 S.Ct. at 829–830. It grounded its holding in principles of statutory construction, however, observing that the same oath had a different meaning in other circumstances, that Congress otherwise had exhibited a policy of religious tolerance in allowing noncombatant military service and that noncombatants who had already served could take the same oath.

Price looks to *Girouard* for support of a First Amendment claim, not for support of the proposition that the INS has misconstrued its statutory authority.[8] We think that the thoughtful dissent of Chief Justice

Stone[9] lays to rest any notion that the Court decided *Girouard* on First Amendment grounds.

> No question of the constitutional power of Congress to withhold citizenship on these grounds was involved. That power was not doubted. The only question was of construction of the statute which Congress at all times has been free to amend if dissatisfied with the construction adopted by the Court.
>
> ... A study of Congressional action taken with respect to proposals for amendment of the naturalization laws since the decision in the Schwimmer case, leads me to conclude that Congress has adopted and confirmed this Court's earlier construction of the naturalization laws. For that reason alone I think that the judgment should be affirmed.

*Id.* at 72–73, 66 S.Ct. at 831 (Stone, C.J., joined by Reed and Frankfurter, JJ., dissenting) (citations omitted). In fact, the critical analysis in the majority opinion addresses the Court's freedom to overrule its precedents in the face of congressional inaction that could be characterized as adoption of the Court's earlier rulings. *Id.* at 69–70, 66 S.Ct. at 829–30. Price finds no support for his First Amendment argument in *Girouard.*

Because a petitioner might be mistaken about whether an organization is of the type prohibited by section 1424(a) and because Question 18 could reasonably reveal information relevant to other requirements for naturalization, the Attorney General's decision that Question 18 is relevant to

---

7. In deportation hearings, the government must prove its case by "clear, unequivocal and convincing evidence." *Berenyi,* 385 U.S. at 636, 87 S.Ct. at 670 (quotation omitted). The fact that the alien carries the burden in naturalization proceedings helps to explain why, despite the sliding-scale theory of alien rights, *see supra* note 6, aliens at naturalization are not necessarily entitled to the full protection of the First Amendment arguably afforded in deportation hearings. *See Harisiades v. Shaughnessy,* 342 U.S. 580, 592, 72 S.Ct. 512, 520, 96 L.Ed. 586 (1952) (upholding the deportation of a member of the Communist Party under the then-applicable First Amendment test); *Parcham v. INS,* 769 F.2d 1001, 1005–06 (4th Cir.1985) (First Amendment protection applies in a deportation hear-

ing); *American–Arab Anti–Discrimination Committee v. Meese,* 714 F.Supp. 1060 (C.D.Cal.1989) (same). Further support for this result is found in the fact that admission of an alien to citizenship is at least as fundamental to the identity of the nation as is the initial decision of whom to admit.

8. We explained *supra* Part II that Question 18 did not exceed the broad authority given the Attorney General to implement the naturalization statutes.

9. In two of the three cases overruled by the majority, which two cases presented issues of first impression, the Chief Justice advanced the majority's arguments in dissent.

determining qualification for naturalization is facially legitimate and bona fide.

The district court's denial of Price's petition for naturalization is AFFIRMED.

NOONAN, Circuit Judge, dissenting:

The Immigration Service propounds a question to persons seeking naturalization that would be intolerable if asked by a government agency of an American citizen. It is an intimidating question. It chills the right of free association guaranteed by the First Amendment.

The Immigration Service's answer is that aliens are different. They are second class people. No doubt for some purposes this characterization is the harsh truth. Since the abolition of slavery aliens are the only adults subject to treatment as second class people in the United States.

The Supreme Court has taken some steps to remedy the aliens' plight when their ill treatment comes from the states. *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976); *Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960). However, the Supreme Court has used language giving great deference to Congress over the admission of aliens. *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977). This deference is defensible when the alien is outside the United States and seeking to enter this country. *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972). It is also appropriate to give deference to Congress and the Executive Branch in matters which "may implicate our relations with foreign powers." *Fiallo*, 430 U.S. at 796, 97 S.Ct. at 1480 (quoting *Mathews v. Diaz*, 426 U.S. at 81–82, 96 S.Ct. at 1892).

The case, however, is substantially different when the alien is a resident and a resident of long standing—in the present case 30 years. Realistically such a person has been conducting himself like an American for a very long time. His reactions to an intolerable inquiry are similar to those of a citizen. Rightly so. He has imbibed the air of freedom which permeates our culture. He insists upon a right not to be treated as a second class person where freedom of association is concerned.

The Supreme Court has drawn a firm line between resident and nonresident aliens. In this case the court relies principally on *Kleindienst v. Mandel, supra.* But Mandel was a revolutionary Marxist from Belgium seeking to enter this country. All precedent was against the judiciary ordering his admission. As Justice Murphy had put it, "The Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores." *Bridges v. Wixon*, 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103 (1945). Justice Murphy had, however, continued: "Once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders." Justice Murphy's views, expressed as a concurrence, were adopted by a unanimous court in *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n. 5, 73 S.Ct. 472, 477 n. 5, 97 L.Ed. 576 (1953). They have recently been quoted and endorsed by Chief Justice Rehnquist writing for the Court in *United States v. Verdugo–Urquidez*, 494 U.S. 259, 271, 110 S.Ct. 1056, 1064, 108 L.Ed.2d 222 (1990). Indeed, Chief Justice Rehnquist italicized the words *"once an alien lawfully enters and resides in this country."* Price lawfully entered the country and resides here. He is "invested with the rights guaranteed by the Constitution to all people within our borders."

The power of Congress to set standards for naturalization is very large, but like every other power of government it is circumscribed; it is not absolute. In *Girouard v. United States*, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946), the Court refused to construe as mandatory a requirement made by Congress that a petitioner for naturalization swear to support the Constitution by taking up arms in defense of this country. The Court did so because otherwise the statute would have been held as unconstitutional. *Girouard*, 328 U.S. at 65, 66 S.Ct. at 827.

In the present case the Immigration Service and this court have construed the stat-

ute in such a way that it is unconstitutional. As construed, the statute permits the Immigration Service to undertake an inquiry far broader than any governmental necessity warrants. The Immigration Service draws to our attention Executive Order 11785 (June 4, 1974) forbidding it to maintain a list of subversive organizations. The Immigration Service may not maintain such a list but under its interpretation of its authority it may snoop into any and all organizations a resident alien has joined.

A narrowly tailored question could be asked of any petitioner without infringing on First Amendment rights. A petitioner could be asked if he had belonged to any organizations dedicated to the overthrow of the government or advocating or using terrorism or if he belonged to any foreign military, paramilitary or intelligence organization. Such a question would have an obvious relevance to the government's legitimate concerns. A question without bounds as to association has no relation to governmental concerns.

The Immigration Service says that the government is concerned with the petitioner's "character." Beyond excluding persons committed to subversion or terror or under the orders of a foreign government, there is no conceivable way that the government can measure a person's character. Persons of all kinds of character make up the United States. The Immigration Service cannot design some fine test by which only persons of outstanding character will be admitted as citizens. In reality we must take our applicants for citizens, as we take our citizens themselves, as a mix of people. That is the way immigrants have come to the United States and peopled it and that is the way it will always be.

The statute is without rational purpose and, infringing severely on the right of free association, it is unconstitutional. I respectfully dissent.