**Olimpia TOVAR, Petitioner,**

v.

**UNITED STATES POSTAL SERVICE, Respondent.**

No. 91–70027.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 12, 1992.

Decided Aug. 31, 1993.

Stephanie Garrabrant, Brobeck, Phleger & Harrison, San Francisco, CA, for petitioner.

Matthew M. Collette, U.S. Dept. of Justice, Washington, DC, for respondent.

Before: REINHARDT, NOONAN, and THOMPSON, Circuit Judges.

REINHARDT, Circuit Judge:

There are two issues before us: whether a United States Postal Service ("Postal Service") regulation that prohibits the employment of temporary resident aliens violates the unlawful discrimination provision of the Immigration Reform and Control Act of 1986

("IRCA"), and whether the Postal Service exceeded its authority under the Postal Reorganization Act of 1970 ("Act") in promulgating the regulation. The administrative law judge ("ALJ") from the Executive Office for Immigration Review at the Department of Justice granted summary judgment for the Postal Service, holding that its refusal to hire Olimpia Tovar, a temporary resident alien, did not constitute unlawful discrimination because the regulation fell within a statutory exemption to the anti-discrimination provision of IRCA; he also held that the Postal Service did not exceed its grant of authority under the Act in promulgating the regulation. Tovar disputes both aspects of the ruling, and also challenges the regulation on fifth amendment due process and equal protection grounds. (Tovar raised the constitutional issues before the ALJ, who declined to decide them because they concerned a regulation not issued by his own agency.) We agree with the ALJ's holding that the regulation falls within a statutory exemption of IRCA. We reverse the ALJ's grant of summary judgment, however, for further proceedings with respect to the question whether the Postal Service exceeded its authority under the Postal Reorganization Act of 1970. Because we decide the case on statutory grounds, we do not reach Tovar's constitutional claims.[1]

## I

Olimpia Tovar entered the United States unlawfully at some time prior to 1982. She obtained a temporary resident card on March 24, 1988, under the amnesty provision of the Immigration Relief and Control Act of 1986 ("IRCA"), Pub.L. 99–603, Title II, § 201(a), 100 Stat. 3394 (1986) (codified as amended at 8 U.S.C. § 1255a(a) (1988)). In January, 1989, Tovar applied for employment with the United States Postal Service ("Postal Service") and took an examination. On April 27, 1989, she filed a declaration of intent to become a United States citizen—a precondi-

tion under IRCA for eventual adjustment to permanent resident alien status. 8 U.S.C. § 1255a(b)(1)(D). On April 28, 1989, Tovar received notice from the Postal Service of her eligibility for the position of flat sorting machine operator. During her orientation for the new position, however, the Postal Service informed Tovar that she was not eligible for employment because she had not yet achieved permanent resident alien status. Under Postal Regulation 312.21, only those non-citizens who have been granted permanent resident alien status are eligible for employment with the Postal Service. It is the validity of that regulation that is at issue here.

As authorized by IRCA, Tovar filed a complaint of unfair immigration-related employment practices against the Postal Service in the Office of the Chief Administrative Hearing Officer ("OCAHO"). 8 U.S.C. § 1324b(d)(2). She alleged that Regulation 312.21 violated the anti-discrimination provision of IRCA, which provides:

> It is an unfair immigration-related employment practice for a person or other entity to discriminate against any individual ... with respect to the hiring, or recruitment or referral for a fee, of the individual for employment or the discharging of the individual from employment—
>
> .   .   .   .   .
>
> (B) in the case of a protected individual (as defined in paragraph (3)), because of such individual's citizenship status.

*Id.* § 1324b(a)(1). It is undisputed that Tovar, an alien *lawfully admitted for temporary residence* pursuant to § 1255a(a), is a "protected individual" under IRCA. *Id.* § 1324b(a)(3).

Believing that no factual issues relating to Tovar's claim were in dispute, the parties filed cross-motions for summary judgment. Tovar charged that Regulation 312.21 constituted unlawful discrimination under § 1324b(a)(1) and exceeded the authority of

---

1. We have jurisdiction over Tovar's statutory claims under 8 U.S.C. § 1324b(i). With respect to the constitutional issues, the record is inadequate. Without an appropriate record, we are unable to assess the strength of the government's interests. We express no view as to how Tovar

should have proceeded with respect to her constitutional claims. We note, however, that the record to be made on remand will likely provide a sufficient basis for deciding the constitutional as well as the statutory issues, should it become necessary for us to do so.

the Postal Service as defined in the Postal Reorganization Act of 1970, Pub.L. 91–375, 84 Stat. 719 (codified as amended at 39 U.S.C. § 101 *et seq.*).[2] The Postal Service argued, in response, that the regulation fell within a statutory exemption to § 1324b(a)(1), which reads as follows:

Paragraph (1) shall not apply to—

. . . .

(C) *discrimination because of citizenship status which is otherwise required in order to comply with* law, *regulation,* or executive order, or required by Federal, State, or local government contract, or which the Attorney General determines to be essential for an employer to do business with an agency or department of the Federal, State, or local government.

8 U.S.C. § 1324b(a)(2) (emphasis added). It further maintained that the regulation was a valid exercise of its authority to promulgate policies and regulations regarding eligibility for employment.

The administrative law judge ("ALJ") concluded that Regulation 312.21 fell within the exemption provided in § 1324b(a)(2)(C) and that in adopting it the Postal Service did not exceed its statutory authority. Accordingly, the ALJ granted the motion of the Postal Service for summary judgment and dismissed Tovar's complaint. As authorized by 8 U.S.C. § 1324b(i), Tovar appealed the ALJ's decision to this court. On appeal, she emphasizes that she challenges the Postal Service's regulation only as it applies to temporary residents under IRCA.[3] We note that the class of temporary residents is self-exhausting, and that the time for filing any complaint regarding employment discrimination while in such status has already run.[4]

Since the ALJ issued his decision, Tovar has been accorded permanent resident alien status. However, because she seeks back pay for the period of time during which she was· considered ineligible for employment with the Postal Service, this case is not moot.

## II

Tovar contends, first, that the ALJ erred in concluding that employment decisions made under Regulation 312.21 are exempt from the anti-discrimination provision of IRCA. The plain language of the statutory exemption invoked by the Postal Service defeats her argument. Moreover, the legislative history of IRCA indicates that the anti-discrimination provision was designed primarily to prevent discrimination on the basis of alienage by private employers, rather than by the federal government.

---

2. She also contended that the regulation violated her fifth amendment rights to procedural due process and equal protection of the law. The ALJ declined to rule on Tovar's constitutional claims on the ground that they concerned a regulation not issued by his own agency. We do not reach her constitutional claims. *See supra* note 1 and accompanying text.

3. In her reply brief on appeal, Tovar presented statistics, apparently compiled by the INS, that showed, she contended, that temporary residents almost invariably succeed in becoming permanent residents. An affidavit in which Tovar's counsel declared that the INS was the source of the statistics accompanied the information. Tovar offered the statistics to buttress her contention that the justification advanced by the Postal Service to support the regulation at issue in this case lacks merit, and thus that in promulgating the regulation, the Postal Service exceeded its statutory authority.

The Postal Service moved to strike Tovar's reply brief, arguing that the new information was outside the record and that including it in a reply brief deprived the Postal Service of an opportunity to respond. To the extent that the brief presents new information, it is improper. Therefore, the following portions of the brief are ordered stricken: page 7, lines 10–23; page 7, line 25–page 8, line 1; page 8, lines 11–28; and tab 4.

4. Under the terms of IRCA, to qualify for temporary residence, an alien must, *inter alia*, register for temporary residency by May 4, 1988, 8 U.S.C. § 1255a(a)(1)(A), 8 C.F.R. § 245a.2(a). The period of temporary residence is brief: under 8 U.S.C. § 1255a(b)(1)(A), all temporary residents must apply for permanent residence no more than three-and-a-half years after being accorded temporary resident status. The consequence of failing to apply for permanent resident status is termination of temporary resident status. 8 U.S.C. § 1255a(b)(2)(C). Thus, under IRCA, all temporary residents must have applied for permanent status no later than November 4, 1991. An alien who wishes to file a complaint regarding unfair immigration-related employment practices must do so within six months of the occurrence of the conduct complained of, 8 U.S.C. § 1324b(d)(3), and appeal from the disposition of such a complaint must be taken within sixty days after the entry of the disposition. *Id.,* § 1324b(i)(1).

In § 1324b(a)(2)(C) of IRCA, quoted above, Congress expressly exempted employment discrimination that is mandated by federal law from the reach of the statutory anti-discrimination provision. The language of the exemption could hardly be clearer. Section 1324b(a)(1) does not apply to "discrimination because of citizenship status which is otherwise required in order to comply with ... regulation." The refusal of the Postal Service to hire Tovar was based on its regulation, which provides that only citizens and permanent resident aliens are eligible for such employment. Accordingly, its refusal could not, as a matter of law, violate § 1324b(a)(1).

Tovar argues that treating the Postal Service regulation as exempt under § 1324b(a)(2)(C) would contravene congressional intent as expressed in the overall statutory scheme of IRCA and in the legislative history of the statute. Ordinarily, where a statute is clear on its face and "no further interpretive assistance is required.... it is proper to look only to the statute's plain language." *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1453 (9th Cir.1992). However, where the language of the statute is uncertain or ambiguous, *id.* or "where a literal interpretation would thwart the purpose of the over-all statutory scheme or lead to an absurd result," *Wilshire Westwood Assoc. v. Atlantic Richfield Corp.*, 881 F.2d 801, 804 (9th Cir.1989) (internal quotation omitted; citation omitted), it may be proper to consider the statute in light of the relevant legislative history. *Mt. Graham Red Squirrel*, 954 F.2d at 1453. We find nothing contrary to an express or implied congressional intent in the interpretation mandated by the plain words of the statute; nor is the result "absurd."

The language of the statutory exemptions to § 1324b(a)(1) demonstrates that Congress intended to allow public employers wide latitude with respect to the anti-discrimination provision of IRCA—latitude that Congress did not extend to private employers. Section 1324b(a)(2)(A), the private sector exemption, excuses only "person[s] or other entit[ies] that employ[ ] three or fewer employees" from the requirements of § 1324b(a)(1). By contrast, § 1324b(a)(2)(C) releases from the constraints of § 1324b(a)(1) all federal, state, and local government employers who have adopted a regulation that mandates discrimination based on alienage. (The remaining statutory exemption, § 1324b(2)(B), which exempts discrimination on the basis of national origin that is exempt under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2, functions purely as a conforming provision.) The effect of § 1324b(a)(2)(A) and § 1324b(a)(2)(C) is to apply the anti-discrimination provision of IRCA rigidly to all private employers virtually without exception, but to apply it only to those public employers who have not adopted contravening regulations. We conclude that in enacting these sections, Congress has indicated its intention to exempt regulations like the one at issue here from the anti-discrimination provision of IRCA.

For historical purposes, we note that the legislative history of IRCA supports our understanding of Congress' intent. That history reveals that Congress included § 1324b in IRCA out of fear that the newly-instituted penalties for hiring illegal immigrants might induce private employers to discriminate against all individuals who sound or appear "foreign." H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 68, *reprinted in* 1986 U.S.C.C.A.N. 5649, 5653, *see* 8 U.S.C. § 1324a(e)(f). Congress was concerned with forestalling any future employment discrimination that might occur as a reaction to IRCA, not with restricting the authority of the federal government to establish criteria for federal employment. Our holding that the discrimination that Tovar complains of is beyond the reach of § 1324b(a)(1) therefore does not thwart the statutory scheme or produce a result contrary to that intended by Congress. Tovar's first argument fails.

## III

In the alternative, Tovar argues that Regulation 312.21 is invalid because, in promulgating the regulation, the Postal Service exceeded the authority conferred on it by the Postal Reorganization Act of 1970, 39 U.S.C. § 101 *et seq.* (the Act). In essence, her

argument is that the regulation is arbitrary, unreasonable, and contrary to law.

Under the Act, the Postal Service possesses "the right ... to hire, promote, transfer, assign, and retain officers and employees in positions within the Postal Service." 39 U.S.C. § 1001(e)(2) (1980). In a section captioned "Postal Policy," the Act further states that the Postal Service "shall provide prompt, reliable, and efficient services to patrons in all areas." Id., § 101(a).[5] The Act empowers the agency to "adopt, amend, and repeal such rules and regulations as it deems necessary to accomplish the objectives of this title." Id., § 401(2).

The Postal Service argues that Regulation 312.21 is within its statutory grant of authority because its governing statute permits it to adopt regulations that promote efficiency. It contends that the Regulation 312.21 heightens efficiency in three ways: it increases the likelihood that the persons the agency hires will become career employees, streamlines a cumbersome process by ridding the agency of the burden of tracking temporary resident employees through the amnesty process to ensure that they attain permanent residency, and reduces the pool of applicants seeking jobs with the Postal Service. We consider these contentions below.

### A.

Before turning to the justifications the Postal Service offers in support of Regulation 312.21, we consider the legal status of the persons whom the regulation excludes from employment—*temporary* residents under IRCA. The Postal Service refuses to hire temporary residents, although it does employ non-citizens once they have achieved *permanent* residence under IRCA.[6] The agency argues that it is justified in distinguishing

between the two classes. We conclude that the record does not support summary judgment for the agency on that question.

To become a temporary resident, an alien must timely apply for temporary residence, 8 U.S.C. § 1255a(a)(1)(A),[7] and must establish both continuous unlawful residence in the United States since January 1, 1982, id. § 1255a(a)(2)(A), and continuous physical presence in the United States since November 6, 1986, id., § 1255a(a)(3)(A). The alien must demonstrate that he or she

> is admissible to the United States as an immigrant, ... has not been convicted of any felony or of three or more misdemeanors committed in the United States, ... has not assisted in the persecution of any person or persons on account of race, religion, nationality, membership in a particular social group, or political opinion, and ... is registered or registering under the Military Selective Service Act ... if the alien is required to be so registered under that Act.

Id., § 1255a(a)(4).

After eighteen months as a temporary resident, the alien may apply for permanent residency. 8 U.S.C. 1255a(b)(1)(A). There is only one additional requirement that she must meet to become a permanent resident, in addition to filing an application for such status within two years of the time she becomes eligible to do so, 8 U.S.C. § 1255a(b)(1)(A). She must demonstrate either a "minimal understanding of ordinary English and a knowledge and understanding of the history and government of the United States," or the satisfactory pursuit of a course of study recognized by the Attorney General to achieve those goals. Id., § 1255a(b)(1)(D)(i). As counsel for the Postal Service conceded at oral argument, all employees of the Postal Service must demon-

---

**5.** This provision is reiterated in 39 U.S.C. § 101(e), which provides that "[i]n determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation, and delivery of important letter mail," and in 39 U.S.C. § 403, "General Duties," which provides, in part: "The Postal Service shall plan, develop, promote, and provide adequate and efficient postal services at fair and reasonable rates and fees."

**6.** The agency refused to employ Tovar when she was a temporary resident under IRCA, but employs her now that she is a permanent resident under that statute.

**7.** As noted above, the period to apply for temporary residence expired on May 4, 1988. 8 C.F.R. § 245a.2(a).

strate a knowledge of English. Therefore, any temporary resident who would be eligible for employment at the Postal Service but for her immigration status would have to meet this part of the requirement in any event. For an English-speaking person, demonstrating a knowledge of basic civics is not an onerous task, and the Postal Service does not suggest otherwise.

Thus, for a temporary resident who, except for immigration status, is qualified for employment with the Postal Service, the transition from temporary to permanent resident is almost automatic. The difference between the two classes is minimal. Even the Postal Service characterizes as "simple" the requirements for adjusting one's status under IRCA from temporary to permanent resident. With this in mind, we turn to the standard under which we review the Postal Service regulation at issue in this case, and the agency's justifications for hiring permanent residents while refusing to hire temporary residents.

### B.

Since the Supreme Court's decision in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we have generally reviewed agency regulations under the standard set forth in that case. In applying *Chevron*, we first consider whether Congress has clearly expressed its opinion on an issue of statutory interpretation. If it has not, the only question remaining for a reviewing court is "whether the agency's answer is based on a permissible construction of the statute." *Id.*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (footnote omitted). In determining whether an agency's construction is permissible, the court considers whether Congress has explicitly instructed the agency to flesh out specific provisions of the general legislation, or has impliedly left to the agency the task of developing standards to carry out the general policy of the statute. In the former case, a reviewing court must find the agency's construction permissible unless it is arbitrary, capricious, or manifestly contrary to the statute; in the latter, a court must uphold the

agency's construction if it is reasonable. *Id.*, 467 U.S. at 843–44, 104 S.Ct. at 2782.

Regulation 312.21 does not fit neatly into the *Chevron* framework. The language of *Chevron* itself speaks of an agency's "construction" or "interpretation" of a statute. 467 U.S. at 843–44, 104 S.Ct. at 2782. Regulation 312.21 is not a construction or an interpretation of a statute; it is an exercise of authority pursuant to a statute. Further, *Chevron* generally applies to implementing regulations that agencies have promulgated within their area of expertise. The principle of deference to the exercise of administrative authority is derived from courts' recognition that agencies possess a body of knowledge that uniquely suits them to accommodate conflicting policies concerning matters within their own area of skill and mastery. *Id.*, 467 U.S. at 844–45, 104 S.Ct. at 2782–83. Neither party in the case before us contends that the Postal Service is singularly qualified in matters of immigration or employment law. Certainly, it has no expertise with respect to the question whether temporary residents under IRCA are more or less likely to be effective employees than permanent residents under that statute. Nor does the Act suggest any such special competence: as its provisions indicate, *supra*, the Postal Service's area of expertise is delivering the mail. Whether temporary resident aliens under IRCA would perform less satisfactorily than permanent residents is a question not closely related to the agency's essential competence.

Nevertheless, though the fit is inexact, we follow the *Chevron* model. We do so rather than create yet another standard of review. Applying the general *Chevron* principles to the regulation, we find that we are faced with a statute that is silent on the subject of the Postal Service's authority to exclude temporary resident aliens from employment. Thus, Congress has manifested no intent on the issue. Nor does the Act instruct the Postal Service to promulgate regulations concerning the citizenship of its employees. Therefore, we analyze Regulation 312.21 as if it were the result of an implicit directive to the agency to develop the criteria under which Postal Service employees shall be hired. Accordingly, we must uphold the reg-

ulation if it is "reasonable." We apply this standard essentially because the agency is authorized to develop policies not involving the construction or interpretation of the statute it administers and not within its special area of competence. Reviewing such policies under a reasonableness standard permits courts to check improper agency actions, and at the same time ensures a sufficient degree of deference to the agency's judgments.[8]

It is prudent to apply the reasonableness standard, the least deferential standard under *Chevron*, to Regulation 312.21 for another reason as well. Regulation 312.21 is not a "regulation" in the sense contemplated by *Chevron*. It is a regulation because a regulation declares it to be a regulation: according to the Postal Service, it is a regulation because 39 C.F.R. § 211.2(a) classifies it as such. That section provides:

> The regulations of the Postal Service consist of:

> •     •     •     •     •

> (3) Headquarters Circulars, Management Instructions, Regional Instructions, handbooks, delegations of authority, and other regulatory issuances and directives of the Postal Service or the former Post Office Department. Any of the foregoing

may be published in the FEDERAL REGISTER and the Code of Federal Regulations.

39 C.F.R. § 211.2(a)(3) ("§ 211.2(a)(3)").[9] There is, of course, no opportunity for public comment in the case of a regulation adopted in this fashion.[10] While courts, including ours, have treated regulations promulgated pursuant to § 211.2 just as they would any other regulations,[11] in no such case has a *Chevron* analysis been undertaken, and in none has the validity of a regulation been at issue.[12] Our review under *Chevron*'s reasonableness standard does not require us to uphold the Postal Service's regulation if it is merely plausible. The reasonableness standard affords courts wider latitude than the arbitrary and capricious standard. It requires, *inter alia*, that the link between a regulation and a legitimate purpose it is intended to advance demonstrate *more* than "the minimum rationality a statute must bear in order to withstand analysis under the Due Process Clause." *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 627, 106 S.Ct. 2101, 2112, 90 L.Ed.2d 584 (1986) (plurality opinion) (quoting *Motor Vehicle Mfrs' Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 n. 9, 103 S.Ct. 2856, 2866 n. 9, 77 L.Ed.2d 443 (1983)). However, we need not discuss the

---

**8.** The Postal Service contends that its hiring practices constitute a matter of policy and that the legislative history of the Act shows that Congress intended to give it the authority to make broad policy decisions. The agency asserts that if we hold that it has authority to make only decisions relating to day-to-day operations, we will open the door to a prolonged course of litigation over what constitutes a decision regarding policy as opposed to a decision regarding day-to-day operations. We agree that the Postal Service has the authority to adopt policies regulating hiring practices. However, that simply leads us to the question of the standard under which we review its adoption of such policies. It is that question we have addressed in the text accompanying this note.

**9.** 39 C.F.R. § 211(a) was first adopted in 1973. 38 Fed.Reg. 20402 (1973).

**10.** In any event, Regulation 312.21 is exempt from the notice and comment provisions of the Administrative Procedure Act. 5 U.S.C. § 553(a)(2) (notice and comment provisions do not apply to matters relating to agency personnel).

**11.** *See, e.g., Wood v. Merit Systems Protection Board*, 938 F.2d 1280, 1282 (Fed.Cir.1991) (regarding a regulation found in a section of the Postal Service Employee and Labor Relations Manual); *United States v. Pittsburg*, 661 F.2d 783, 785 n. 1 (9th Cir.1981) (finding that a regulation adopted pursuant to 39 C.F.R. § 211.2 preempts local law); *Page v. Bolger*, 645 F.2d 227, 235 & n. 10 (4th Cir.1981), *cert. denied*, 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981) (enforcing against the Postal Service a regulation regarding procedures for promotion that was adopted pursuant to § 211.2).

**12.** We have held that employment handbooks, agency guidelines, departmental bulletins, and other materials similar to that in which Regulation 312.21 is found do not afford substantive rights to members of the public where such rules are intended for internal agency use only. *See Multnomah Legal Services Workers Union v. Legal Services Corp.*, 936 F.2d 1547, 1554 (9th Cir. 1991), and cases cited therein. The regulation before us is clearly intended for external as well as internal use. In any event, Tovar does not challenge the status of Regulation 312.21 as a regulation.

nature of our inquiry further. For summary judgment purposes, the Postal Service's regulation fails the reasonableness test completely.

### C.

On appeal from summary judgment we consider whether there is any "genuine issue of material fact" and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To defeat the government's motion for summary judgment where the government made no factual showing as to the reasonableness of a regulation at issue, Tovar needed only to demonstrate that the regulation was facially discriminatory or that it operated in a discriminatory manner. In fact, all that a plaintiff is required to show in such a case is that a genuine issue of material fact exists as to the discriminatory nature of the regulation at issue. In the face of such a showing, the government cannot prevail by relying on the regulatory language exclusively or by merely offering factually unsupported explanations. If a regulation is facially discriminatory or there is evidence that it operates in a discriminatory fashion, the government is obligated, at a minimum, to offer concrete, evidentiary facts that explain why the regulation is nevertheless reasonable. Conclusory statements are insufficient.

Here, the ALJ specifically found that the Postal Service's regulation was *facially* discriminatory because it created a barrier to employment based on group status, *i.e.* temporary residency. He also found that Tovar was denied employment not because she was personally unqualified but because she belonged to the disfavored class of temporary residents. Thus, there is no question that *some evidence* existed to support Tovar's claim that Regulation 312.21 was unreasonable. The Postal Service could not stand silent in the face of these facts, but was

required to offer specific evidence to show that its regulation was reasonable. *See Pruitt v. Cheney,* 963 F.2d 1160, 1165–66 (9th Cir.1992) (government must establish *in the record* its justification for the rationality of its group-status regulation), *cert. denied,* —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992); *High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563, 575–77 (9th Cir.1990) (government must *show* a rational basis for its policy by establishing a rational relationship between its group-status policy and a legitimate governmental interest).[13]

As explained below, in this case the Postal Service has failed to offer any *facts* that would enable us to examine the link between the policy established by its facially discriminatory regulation and a legitimate purpose that the regulation is intended to advance. Instead, it offers conclusory and wholly unsupported generalizations that do not permit us to evaluate its claims.[14] We note also that the Postal Service has sole possession of the facts necessary to prove that its regulation promotes "efficiency." Under all of these circumstances, the Postal Service is not entitled to summary judgment.

Even if we did not believe that it was the Postal Service's responsibility to offer facts that show that Regulation 312.21 is reasonable, we would nevertheless reverse the award of summary judgment. In a case such as this, an appellate court may, in the interests of sound judicial administration, vacate a summary judgment without reaching the merits of the issue presented if the record has not been sufficiently developed to allow for a fully informed decision. *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 256–57, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347 (1948); *Anderson v. Hodel,* 899 F.2d 766, 770–71 (9th Cir.1990); *see also* William Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,*

---

**13.** The dissent suggests that the analysis here should be conducted under an even lower level of scrutiny than that employed in *High Tech Gays* and *Pruitt,* because this case involves an administrative rather than an equal protection challenge to the reasonableness of a regulation. That this is an administrative rather than a constitutional case, however, does not mean that in reviewing

for reasonableness we apply a lower standard. Indeed, as noted above, *Bowen* requires us to subject a regulation to *closer* scrutiny in an administrative than in a constitutional case. 463 U.S. at 43 n. 9, 103 S.Ct. at 2866 n. 9.

**14.** *See infra* Part III.D.

99 F.R.D. 465, 475 (1984). In *Anderson* we vacated a summary judgment order that held that the governmental conduct there at issue was lawful, precisely because the record was insufficient to allow us to review the propriety of that conduct. 899 F.2d at 770–71. In *Kennedy* the Supreme Court declined to construe the Fair Labor Standards Act because the record created before the trial court at summary judgment was inadequate, and remanded the case for creation of an adequate record. 334 U.S. at 256–57, 68 S.Ct. at 1034.

We believe that the above principle applies with equal force to this case. While the regulation challenged here may not be as far-reaching or complex as the governmental actions at issue in *Anderson* or *Kennedy*, the salient question in each case is whether there is a sufficient factual record to allow the appellate court to decide the case before it. As Judge Schwarzer has aptly observed in his landmark article on summary judgment, "[T]he appellate court, if it concludes that a critical issue of ultimate fact has not been sufficiently developed and considered, should remand for that purpose." 99 F.R.D. at 475.

Here, we are faced with a challenge to the reasonableness of an important agency regulation, but have not been given a factual foundation that would permit us to render a decision as to the regulation's lawfulness. Where a challenge is made to the legitimacy of a sensitive governmental act, particularly one that deprives an individual of equal access to a public benefit, it is especially critical that the decisionmakers be provided with adequate information. If a regulation is erroneously upheld because of the absence of a sufficient factual record, an illegitimate exercise of governmental power will remain unchecked. On the other hand, if a regulation is struck down on the basis of inadequate information, then important governmental purposes may well be frustrated. The decisionmakers in such cases have a duty to ensure that their determinations are based upon an appropriate factual record. Because the ALJ in this case granted summary judgment without a proper factual record—*i.e.*, a record sufficient to permit us to make the requisite evaluation of the reasonableness of the Postal Service's regulation—we cannot affirm his order.

### D.

The Postal Service offers several conclusory justifications for its challenged regulation. Its justifications may, in the end, prove to be correct. However, bare assertions or unsupported conclusions are not facts sufficient to support either a summary or a post-trial judgment. *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993). We now proceed to examine the government's assertions and conclusions. Our analysis demonstrates why the grant of summary judgment was inappropriate in this case.

### 1. Career Employees

The Postal Service argues, first, that Regulation 312.21 heightens efficiency by increasing the likelihood that its employees will make their careers in the Postal Service. Temporary residents, it argues, might be deported after the Postal Service has gone to considerable expense to hire and train them. In support of its justification, the agency presents the declaration of Carol L. Booher, the Manager of the Selection Systems Administration Branch in the Employee Relations Department of the Postal Service.[15] Booher is "responsible for the evaluation and implementation of all regulations relating to the selection of applicants for employment for the Postal Service." Booher Declaration at ¶ 2. On the issue whether Regulation 312.21 increases the agency's efficiency by

---

**15.** Booher's declaration is dated June, 1990. It is thus not contemporaneous with Regulation 312.21. Generally speaking, a reviewing court may consider only the justifications for a rule advanced by the agency at the time the rule was promulgated; it may not consider *post hoc* justifications. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). However, when a regulation is promulgated pursuant to an exception to the notice and comment requirements of the Administrative Procedures Act, 5 U.S.C. § 553, no contemporaneous record ordinarily exists. It is permissible under such circumstances to rely on *post hoc* justifications for the rule. *Women Involved in Farm Economics v. United States Dep't of Agric.*, 876 F.2d 994, 997–1000 (D.C.Cir.1989).

promoting its interest in hiring career employees, Booher stated,

> the Postal Service ... determined [after reviewing Regulation 312.21] that based on its primary interest in career or permanent employees, the current policy sufficed to give all aliens opportunities once they qualify as permanent resident aliens while avoiding the potential loss of efficiency in hiring persons who do not ultimately qualify for permanent status and/or lose their clearance to work in the United States.

Id. at ¶ 9. Booher's declaration here presents no facts, only a conclusion.

Booher's declaration must be considered in light of the legal difference between temporary and permanent residence under IRCA. As explained above, the transition from temporary to permanent status is practically automatic. It does not require the alien to perform any task of any significance.[16] If the adjustment required temporary residents to perform tasks that a number of them might be expected to fail, Booher's declaration might be enough to warrant a grant of summary judgment. But, as the law stands, the adjustment in status requires virtually nothing. Booher does not allege any facts that tend to show that aliens are more likely to lose their authorization to work in the eighteen months before they become permanent residents than they are after they have been awarded permanent status—or that *any* temporary residents have ever done so. Nor does Booher's declaration demonstrate that temporary residents are less likely than permanent residents to leave the Postal Service for other employment. It does not state that a significant number—or *any* number— of temporary residents who are eligible for permanent status have failed to achieve it. Certainly it does not state that temporary residents *who otherwise qualify for employment at the Postal Service* tend to fail to achieve permanent resident status. Figures from the INS—even preliminary ones—that show that temporary residents are more likely to lose their authorization to work in the United States than permanent residents, or

that suggested that a significant number of temporary residents eligible for permanent status failed to achieve it, might, if unrebutted, have entitled the Postal Service to summary judgment. However, Booher's wholly unsupported conclusion cannot provide adequate support for the Postal Service's decision to promulgate Regulation 312.21. As a matter of law, the agency is not entitled to summary judgment on the basis of this justification.

### 2. Burden of Hiring and Tracking

The agency contends, next, that Regulation 312.21 streamlines an otherwise cumbersome application process. It argues that its efficiency would be undermined by the administrative burden of hiring temporary residents and of tracking their immigration status to ensure that they attained permanent residency. The agency's second justification for Regulation 312.21 is no stronger than its first. Again, its sole support is Booher's declaration, which states, in pertinent part,

> As a result of the size of its operation, therefore, the Postal Service determined that the additional administrative burden of processing the additional paperwork required for temporary resident aliens ... as well as continuing to track such persons to assure continued clearance to work was not warranted for the resulting addition to the applicant pool.

Booher Declaration at ¶ 8. There are no facts in this part of Booher's declaration either, and it is based on one, if not two, erroneous legal assumptions.

As to the first part of the statement, it is silent regarding the extent or the nature of the administrative burden. Booher makes no factual assertion whatever regarding this alleged burden. Therefore, once again, the statement is wholly conclusory. More important, if we assume that Booher is referring to a burden that arises from an obligation to verify the status of temporary residents under IRCA that is *different* from the burden imposed with respect to permanent residents, naturalized citizens, or native-born cit-

---

16. It does require the applicant to exhibit a knowledge of English, but, explained above, so does employment at the Postal Service. Thus,

for a temporary resident employed by the Postal Service, the adjustment to permanent resident is almost involuntary. *See supra* Part III.A.

izens, she is simply wrong. To comply with IRCA, the Postal Service must verify, at the time an employee is hired, that the employee is authorized to work in the United States. 8 U.S.C. § 1324a(b). IRCA imposes that burden with respect to *all* employees, however. The Postal Service, like all other employers, must verify the authorization to work of *every employee*—temporary resident, permanent resident, naturalized or native-born citizen. *Id.* Therefore, hiring a temporary resident imposes no greater administrative burden on the Postal Service than hiring any other person. The number of employees will be the same, regardless of whether temporary residents are hired, and so will the burden of determining their eligibility to work.

As to the second part of Booher's statement, the legal premise underlying her assertion regarding the tracking requirement is also incorrect. There is simply no tracking requirement. The law does not require an employer to verify an employee's immigration status on a continuing basis, nor can the Postal Service point to any such requirement.[17] The original verification is *all* that is required. Again, therefore, the argument is based on an erroneous legal assumption.[18]

Because there is no conceivable legal justification for the Postal Service's rationale that 1) verifying the immigration status of temporary residents is more burdensome (or even imposes a different burden) than doing so for other employees, and that 2) it must track the immigration status of its employees, we

cannot affirm summary judgment based upon this contention.[19]

### 3. Reduced Applicant Pool

Finally, the Postal Service argues that Regulation 312.21 increases efficiency by reducing the agency's pool of potential employees. Once again, the agency's only support for its justification is Booher's declaration, which states that, if the Postal Service accepted temporary residents for employment,

> [its employee] selection process would be substantially burdened administratively by broadening the alien selection policy. Such a policy would result in an increase in an applicant pool which was already larger than necessary while making [it] more difficult to administer a current postal [employee] selection system which is costly and complex in operation.... As a result of the size of its operation, ... the Postal Service determined that the additional administrative burden of processing the additional paperwork required for temporary resident aliens or other persons qualified to work in the United States ... was not warranted for the resulting addition to the applicant pool, particularly in light of the overwhelming abundance of applicants for postal positions. In fact, the Postal Service has actively explored methods for reducing the overall number of examinations given each year.

Booher Declaration at ¶¶ 5, 8. There are two separate answers with respect to this

---

**17.** We realize that the class of aliens who are not permanent residents is not limited to the class of temporary residents under IRCA. It also includes, for example, applicants for asylum, applicants for citizenship or residency based on marriage to a citizen or permanent resident, and holders of student visas. However, the class of temporary residents at issue in *this* case is limited to those temporary residents under IRCA. Under IRCA, liability attaches only if the employer gains *actual knowledge* that his or her temporary resident employees have lost their authorization to work in the United States. 8 U.S.C. § 1324a(a)(2).

**18.** At oral argument, counsel for the Postal Service offered an additional reason for the agency to track the immigration status of its employees: to ensure that it has hired career employees. However, it seems to us self-evident that the

Postal Service need not track its employees to determine whether or not they will continue to work at the agency. Moreover, the *post hoc* rationalization of an agency's appellate counsel, advanced for the first time on appeal, is entitled to no deference. *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 156–57, 111 S.Ct. 1171, 1179, 113 L.Ed.2d 117 (1991). In any event, counsel's suggestion, like the Booher declaration, is unsupported by any evidence that might assist us in evaluating the agency's decision.

**19.** In any event, even if there were a legal justification for a verification and tracking policy, the Postal Service would still have to make some minimal factual showing as to the nature and extent of the burden imposed. None is, of course, offered.

purported rationale, each dispositive in its own way. First, a temporary resident under IRCA is eligible for permanent residence after completing an eighteen-month waiting period, and the change in status is virtually automatic.[20] Booher does not explain why accepting applications for employment from persons while they are still in the initial status of temporary resident increases the pool any more than accepting their applications eighteen months later after they have become permanent residents. The question is simply one of timing, not of the extent of the burden. The pool will be larger one year and smaller another, with or without Regulation 312.21. The only question is: in which year will the pool be larger? The number of temporary residents under IRCA is finite. Thus, a fixed number of potential employees will be eligible to become part of that pool at one time or the other. Accordingly, Booher's rationale simply falls flat of its own accord. In this respect also, the Postal Service has totally failed to advance a "reasonable" explanation for its regulation.

Second, even if the question *were* the size of the pool (and not the time at which the finite group becomes part of it), the Postal Service would still need to present *some* facts as to what the impact of these additional applicants would be. Booher says the additional applications would mean more paperwork. However, to evaluate the reasonableness of the regulation, we would have to have *some* idea of what that means. One additional sheet of paper, total, is more paperwork, but not enough more to make the regulation reasonable. We are unable to determine the nature of the burden—whether it is one percent more paperwork or fifty—because Booher's declaration simply offers no facts.

### E.

The Postal Service's motion for summary judgment stands or falls on Booher's declaration. However, that declaration presents only conclusory assertions with respect to two of the three asserted justifications for Regulation 312.21; as to the third, because of its erroneous legal assumptions, nothing would save the government. We hold that

the declaration is insufficient to justify a grant of summary judgment in the agency's favor. We emphasize that the agency could prevail on a motion for summary judgment if it offered sufficient facts to show that it is entitled to such relief as a matter of law. *Valladolid v. Nat'l City,* 976 F.2d 1293, 1295 (9th Cir.1992). However, for the reasons suggested above, it would undoubtedly have considerable difficulty in attempting to do so. In any event, on the record before us, the agency clearly has not made such a showing. Nor is the record otherwise sufficient to permit us to determine the reasonableness of the regulation.

### IV.

In summary, we hold that Regulation 312.21 does not violate IRCA's statutory bar on unlawful discrimination. However, given Tovar's showing that the regulation served to preclude her employment based not on her individual qualifications but on her group status, we hold that the Postal Service has not offered sufficient facts to support a conclusion that, in adopting the regulation, it acted within its authority under the Postal Reorganization Act. Moreover, in light of the undeveloped state of the factual record, we are unable to conduct a proper review of the lawfulness of the Postal Service's regulation. Therefore, the ALJ erred in granting summary judgment. Accordingly, we must vacate and remand for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

DAVID R. THOMPSON, Circuit Judge, concurring in part and dissenting:

I concur in Parts I and II of the majority opinion. I respectfully dissent from Part III.

A. The Postal Service's Authority to Adopt the Regulation Under Its Organic Statute

Tovar contends that even if IRCA allows the Postal Service to adopt regulations that discriminate, the Postal Reorganization Act of 1970 (the "Postal Act") does not confer

---

**20.** *See supra* Part III.A.

authority on the Postal Service to adopt regulations excluding persons from employment based on their immigration status. Her principal argument is that the Regulation at issue is not reasonable because it is inefficient, contrary to the Postal Service's mandate from Congress. She also argues that the Regulation exceeds the regulatory power vested in the Postal Service by the Postal Act because the Regulation has "constitutional implications" and because it institutes a "broad policy guideline."

The majority reverses the summary judgment in favor of the Postal Service and remands for an evidentiary hearing on the question whether the Regulation is "reasonable." I would affirm.

The majority and I agree that *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), provides the proper standard of review on the question of reasonableness. We also agree the reasonableness test requires that "the link between a regulation and a legitimate purpose it is intended to advance demonstrate *more* than 'the minimum rationality a statute must bear in order to withstand analysis under the Due Process Clause.'" Majority at 1277–1278 (quoting *Bowen v. American Hospital Ass'n,* 476 U.S. 610, 627, 106 S.Ct. 2101, 2112, 90 L.Ed.2d 584 (1986) (plurality opinion)).

The majority says "the agency has failed to offer *facts* that would enable us to examine" the reasonableness of the Regulation and that instead the agency offers "wholly unsupported generalizations that do not permit us to evaluate its claims." According to the majority, the failure of the agency to offer these facts precludes summary judg-

ment in its favor. In arriving at this conclusion, the majority has mistakenly turned the Postal Service into the claimant, has incorrectly applied the summary judgment rule and has placed the burden of proof on the wrong party.

### 1. Requirements for Summary Judgment

Under 28 C.F.R. § 68.38(c) (1992), the ALJ "may enter a summary decision for either party if the pleadings, affidavits, material obtained by discovery or otherwise, or matters officially noticed show that there is no genuine issue as to any material fact and that a party is entitled to summary decision." *See also* Fed.R.Civ.P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The problem here is not a clash over the facts. Indeed, both Tovar and the Postal Service believed that this case was ripe for summary adjudication. The majority simply believes that the Postal Service has not come forward with a "properly supported" motion for summary judgment. The defect, according to the majority, is the insufficiency of the Booher Declaration. But, of course, summary judgment could have been granted to the Postal Service "regardless of whether the moving party accompanies its summary judgment motion with affidavits." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).[1] Rule 56 does

---

1. In rejecting the Booher Declaration, the majority asserts: "[B]are assertions or unsupported conclusions are not facts sufficient to support either a summary or a post-trial judgment. *See MAI Systems Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 518 (9th Cir.1993)." Maj. at 1279. This language mischaracterizes *MAI Systems* and exposes the flaw in the majority's analysis.

Under *Celotex,* the moving party is not required to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. Rather, "[a] party *opposing* a properly

supported motion for summary judgment may not rest upon the mere allegations or denials in pleadings, but 'must set forth specific facts showing that there is a genuine issue for trial.'" *MAI Systems,* 991 F.2d at 518 (quoting Fed.R.Civ.P. 56(e), and citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis added)).

In *MAI Systems,* it was the nonmoving party, the defendant Peak, who failed to come forward with more than "mere argument" to defeat summary judgment. *MAI Systems,* 991 F.2d at 518. Here, the nonmoving party, Tovar, failed to come

not place an evidentiary burden on the moving party. Instead, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553.

The moving party's burden is to show "an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. When the moving party carries this burden, the entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

Here, the Postal Service is the moving party. Tovar will bear the burden of proof at the evidentiary hearing on remand. And it is *Tovar* who has not come forward with any evidence to establish that the Postal Service's Regulation is inefficient or unreasonable, regardless of any deficiency in the Booher Declaration.

### 2. The Burden of Proof Under Chevron

In every civil case, the plaintiff (here Tovar) bears the burden of proving at trial all of her claims, including contentions that an agency has unreasonably interpreted its statutory authority to regulate. In the administrative context, the typical case is not one such as this where an individual allegedly denied a benefit sues the agency and challenges the regulation. Instead, a regulation is typically challenged under *Chevron* when the agency seeks to enforce it through civil or administrative proceedings. In such proceedings the challenge to the regulation is an affirmative defense. In every civil case, the defendant bears the burden of proof as to each element of an affirmative defense.

*Chevron* jurisprudence has always implicitly regarded the person challenging the regulation as bearing the burden of proof, not the agency. The burden is not on the agency to

justify its own regulation. *See Maryland Dept. of Human Resources v. United States Dept. of Agric.,* 976 F.2d 1462, 1476 (4th Cir.1992) ("Maryland would turn *Chevron* analysis on its head. In effect, Maryland wants USDA to bear the burden of showing affirmatively that the state's interpretation of the statute is inconsistent with congressional intent.... This the agency is not required to do."); *Cabrera v. Martin,* 973 F.2d 735, 746 n. 6 (9th Cir.1992) (plaintiffs would have "to show that the federal defendants' interpretation of [a statute and a regulation] was *unreasonable* in order to prevail against the federal defendants.") (dicta).

The majority has placed the burden of proof on the Postal Service. The majority says the Postal Service's burden is to show that the Regulation is "reasonable," concluding, "the Postal Service could not stand silent in the face of these facts [that Tovar was discriminated against], but was required to offer specific evidence to show that its regulation was reasonable. *See Pruitt v. Cheney,* 963 F.2d 1160, 1165–66 (9th Cir.1991) (government must establish in the record its justification for the rationality of its group-status regulation); *High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563, 575–77 (9th Cir.1990) (government must *show* a rational basis for its policy by establishing a rational relationship between its group-status policy and a legitimate governmental interest)." Majority at 1278.

In its analysis, the majority searches the record to find a reasonable justification by the agency for the Regulation's facial discrimination. The majority searches for the wrong evidence. This is not an equal protection case such as *Pruitt* or *High Tech Gays.* The question here is whether under *Chevron* the Regulation is a reasonable interpretation of the statute that requires the Postal Service to operate efficiently. Tovar must present evidence that shows the Regulation is inefficient, not just that it is discriminatory. By grafting the reasonableness requirement in an equal protection case onto the standard for review of agency action under *Chevron,*

---

forward with evidence showing that the Postal Service's Regulation is inefficient or unreasonable. She will bear the burden of proof on these

issues at trial. Consistent with *Celotex* and *MAI Systems,* the ALJ did not err in entering summary judgment against her.

the majority deftly avoids addressing the lack of any evidence to show that the Regulation is inefficient.

Recognizing the weakness inherent in its approach, the majority then falls back on the teachings of *Anderson v. Hodel,* 899 F.2d 766 (9th Cir.1990), as an alternative holding. This is effectively a remand to let Tovar find some more evidence showing that the regulation is inefficient.

This is not a complex statute like the one in *Anderson.* If the evidence existed to create a genuine issue of material fact as to inefficiency, then Tovar should have presented this evidence to the ALJ. After all, she believed she had sufficient evidence to support summary judgment in her favor.

### 3. *The Postal Service's Authority to Promulgate the Regulation*

Under 39 U.S.C. § 1001(e)(2), the Postal Service is authorized to hire employees. Nothing in this section grants regulatory powers. However, the Postal Service's power to promulgate the Regulation derives from 39 U.S.C. § 401. Section 401 reads in part: "The Postal Service shall have the following general powers: ... (2) to adopt, amend, and repeal such rules and regulations as it deems necessary to accomplish the objectives of this title."

The relevant objectives of the Postal Act are set forth in three separate provisions. 39 U.S.C. § 101(a) reads: "[The Postal Service] shall provide prompt, reliable, and efficient services to patrons in all areas." 39 U.S.C. § 101(e) adds the requirement: "In determining all policies for postal services, the Postal Service shall give the highest consideration to the requirement for the most expeditious collection, transportation and delivery of important letter mail." 39 U.S.C. § 403 lists these general responsibilities:

(a) The Postal Service shall plan, develop, promote and provide adequate and efficient postal services at fair and reasonable rates and fees....

(b) It shall be the responsibility of the Postal Service—

(1) to maintain an efficient system of collection, sorting, and delivery of the mail nationwide.

The Postal Act thus requires the Postal Service to operate efficiently. Tovar contends that the Regulation is unreasonable because it is inefficient. The majority opinion concludes that the failure of the Postal Service to provide sufficient facts supporting its position that the Regulation is efficient precludes summary judgment. Not only does this place the burden on the wrong party and misinterpret *Chevron,* it overlooks the fact that the Postal Service adopted the Regulation to carry out its mandate to operate an efficient postal service. In its view, it would be expensive and difficult for it to track temporary resident alien employees through the process of applying for permanent residency, and therefore inefficient to do so.

Tovar's only response to this showing is her unsupported argument that discrimination against potential employees is inefficient in itself. The Postal Service, however, explains through the Booher Declaration that it is more efficient for it to hire career employees, that IRCA interferes with this interest, and that IRCA imposes an administrative burden on employers of temporary resident aliens.

Under IRCA, temporary resident aliens must apply for permanent residency, learn English and some elementary civics, and declare their intent to become citizens within a two-year period. Failure to do so makes an alien eligible for deportation. If the Postal Service were to hire temporary resident aliens as career employees, the only way it could be sure they timely applied for permanent residency and followed through with their applications would be to monitor this process. This would be an administrative burden. Although, as the majority notes, there is no requirement in IRCA that an employer verify the employee's status on a continuing basis, the lack of a requirement does not prevent the Postal Service from wanting to know the citizenship status of its employees to promote career employment objectives.[2] This is an administrative burden

---

2. Although this sort of discrimination between    classes of aliens and between aliens and citizens

the Postal Service has chosen to avoid by refusing to hire temporary resident aliens. Tovar proffered no evidence that it was unreasonable or inefficient for the Postal Service to want to avoid this tracking burden or that the Regulation was an unreasonable method to accomplish this.

Moreover, if some temporary resident aliens were to lose their authorization to work in the United States while employed by the Postal Service, the Postal Service could lose these employees by action of the Justice Department. The Postal Service believes temporary resident aliens are more likely to leave the United States than permanent resident aliens, whether through a failure to properly apply for permanent status, to fulfill the requirements for permanent status, or by choice. *See* Booher Declaration at ¶ 9. Thus, hiring temporary resident aliens could interfere with the Postal Service's objective of promoting career employment.

"When a challenge to an agency's construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do." *Chevron*, 467 U.S. at 866, 104 S.Ct. at 2793.

The Postal Service's policy may have been a poor choice.[3] Its justification for the policy may be weak. But Tovar has presented nothing to show that the Regulation is an unreasonable interpretation of the statute's requirement that the mail be delivered efficiently.

The majority, by excusing Tovar from her proper burden, holds the ALJ erred in granting summary judgment. With that holding, the majority finds it unnecessary to consider any of Tovar's other arguments. Because I

differ from the majority on this issue, I address Tovar's additional contentions.

Tovar argues that regardless of whether the Regulation is reasonable, the Postal Service did not have the power to adopt it. She argues that the Postal Act reserves to Congress, not the Postal Service, the power to set policy guidelines for the Postal Service when that policy has "constitutional implications." She asserts that because the Postal Service's refusal to hire temporary resident aliens has constitutional implications, the adoption of the Regulation exceeds the power to regulate vested in the Postal Service by 39 U.S.C. § 401(2). This argument should be rejected.

The Postal Service makes numerous decisions that have constitutional implications. *See, e.g., United States v. Kokinda*, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (Rejecting a First Amendment challenge, the Supreme Court affirmed the defendants' criminal convictions for violating the Postal Service's regulation that bans soliciting contributions and political activity on Postal Service property, 39 C.F.R. § 232.1(h)(1) (1989).). Never has a court concluded that Postal Service regulations with constitutional implications such as the one upheld by the Court in *Kokinda* were an unreasonable exercise of the powers granted by the Postal Act.

Tovar contends the legislative history of the Postal Act requires that Congress establish "broad policy guidelines" for the Postal Service and that the Postal Service may only adopt regulations to facilitate management of its "day-to-day activities." She argues that a ban on hiring temporary resident aliens is a "broad policy" exceeding the Postal Service's power.

We need not decide whether the Postal Service can issue regulations making broad

---

is exactly what IRCA intended to prevent in the private sector, a federal agency may discriminate in hiring under IRCA. An agency may not, however, discriminate in violation of the Constitution. This issue is addressed in Part B of this dissent.

**3.** Tovar's strong examination score and the fact that she eventually attained permanent residency indicate she will prove to be a good employee.

She has also shown that for a period of time the Postal Service had to function without her services. She has not, however, come forward with any evidence that permanent residents and citizens could not perform with equal efficiency the job she took as a flat sorting machine operator. The fact that she can do the job does not establish the inefficiency of the Regulation.

policy guidelines, because Congress has promulgated specific guidelines pertaining to employment of non-citizens in federal service. Since 1938, Congress has excluded most aliens from government service in annual appropriations acts. *See, e.g.,* Pub.L. 102–393, Title VI, § 607, 106 Stat. 1729, 1766–67 (Oct. 6, 1992) (Appropriation through September 30, 1993); *see also* 5 U.S.C.A. § 3101 (note) (West Supp.1993), *Hampton v. Mow Sun Wong,* 426 U.S. 88, 108, 96 S.Ct. 1895, 1907, 48 L.Ed.2d 495 (1976). To the extent that the Postal Service has deviated from these guidelines and adopted a contrary "policy," it has done so by hiring *more* aliens than the rest of the federal government, using its non-appropriated revenues. Tovar does not explain how the Postal Service's more expansive policy of hiring eligible permanent resident aliens is an unreasonable interpretation of the Postal Service's authority to adopt regulations under section 401(2) of the Postal Act.

If the legislative history of the Postal Act relied upon by Tovar carries any weight, it is evidence that the Postal Service has reasonably interpreted its authority to issue the challenged Regulation. This court is not in a position to press upon the Postal Service a requirement that it adopt even more progressive hiring policies, either under the Title 39 "efficiency" language or the Constitution. In sum, I would reject Tovar's contention that the Regulation exceeds the Postal Service's authority to regulate granted by the Postal Act.

## B.   Tovar's Constitutional Claims

The ALJ stated his "power to rule on constitutional questions might not extend to a review of the constitutionality of other agency statutes or regulations." ALJ Decision at 12. He therefore dismissed Tovar's constitutional claims for lack of jurisdiction.

The parties have agreed on the facts that give rise to Tovar's constitutional claims, and the record is sufficient for us to consider these claims without remand.[4] Accordingly, we may consider these constitutional issues for the first time on appeal. *See Reid v. Engen,* 765 F.2d 1457, 1461 (9th Cir.1985).

Tovar contends that the Regulation violates the Fifth Amendment. She relies primarily on *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976). In *Hampton,* the Court held that a Civil Service Commission regulation which excluded all aliens from employment in the competitive civil service deprived all aliens as a class of a liberty interest in employment with the federal government without due process of law.[5] *Id.* at 116, 96 S.Ct. at 1911. Tovar asserts that under *Hampton* the Postal Service's Regulation 312.21 is flawed in two respects: it denies temporary resident aliens a liberty interest in employment without due process and it denies temporary resident aliens equal protection of the laws.

At the outset, it is important to note two principal differences between the facts here and the facts in *Hampton.* First, the degree of the deprivation is substantially less here. In *Hampton,* all aliens were denied the opportunity for a large proportion of jobs in the government. 426 U.S. at 90–92 & n. 1, 96 S.Ct. at 1899–1900 & n. 1. Here, only a discrete group of aliens is denied an opportunity for employment with the Postal Service. Also, this discrete group of temporary resident aliens is not permanently denied employment. With some effort, and in as little as eighteen months, temporary resident aliens may attain permanent status, as Tovar has, and become employable by the Postal Service.

Second, unlike the Civil Service Commission in *Hampton,* the Postal Service has

---

4.   The majority gives no indication as to why it believes "the record is inadequate" to assess the strength of the government's interests. Maj. at 1272 n. 1. The Postal Service has offered three justifications for its Regulation. We know exactly what means the Postal Service has chosen to accomplish its professed aims of administrative efficiency—exclusion of temporary residents. We have sufficient information to scrutinize these justifications for their legitimacy and to test

the relationship between the ends and the means, which is the extent of our constitutional role.

5.   During the pendency of the *Hampton* litigation, the Postal Service broke ranks with the rest of the government and began to employ permanent resident aliens in most positions. *Hampton,* 426 U.S. at 97–98 & n. 13, 96 S.Ct. at 1902–03 & n. 13. This policy continues.

adopted the Regulation for reasons closely related to its management of personnel. The Postal Service asserts that the Regulation furthers administrative efficiency and its interest in career employment. The Postal Service does not rely on a contention that the Regulation advances national security interests that would properly be the concern of the President, or that it advances the desire of temporary resident aliens to obtain permanent residency, which would properly be the concern of the Justice Department and the INS. The Postal Service relies on the fact that the Regulation was adopted to address its concerns for management of its personnel.[6] In this circumstance, to survive a due process test "the rule must be justified by reasons that are properly the concern of the agency." *Yassini v. Crosland,* 618 F.2d 1356, 1362 (9th Cir.1980) (per curiam).

The *Hampton* Court indicated that had the Civil Service Commission's exclusionary regulation been adopted to promote administrative efficiency, which was properly within the province of that agency, the regulation would have had a rational basis. *Hampton,* 426 U.S. at 115, 96 S.Ct. at 1911. The administrative efficiency justification failed in *Hampton* because the Civil Service Commission never made any considered evaluation of the desirability of excluding all aliens, because the burden of establishing job classifications that could accommodate some aliens was not great, and because the "wholesale deprivation of employment opportunities" required rejection of an administrative convenience justification. *Id.* at 115–16, 96 S.Ct. at 1911.

In contrast to the regulation in *Hampton,* the Regulation at issue here might have been adopted "by an expert in personnel matters" for administrative convenience. *Id.* at 115, 96 S.Ct. at 1911. The record shows that the Postal Service reviewed the Regulation after

the passage of IRCA and balanced the Postal Service's interest in giving all aliens an opportunity for employment against the potential loss of efficiency if temporary resident aliens employed by the Postal Service were to lose their clearance to work in the United States.

In sum, we have before us a lesser deprivation of liberty than in *Hampton,* and the Postal Service has justified its decision not to hire temporary resident aliens for reasons within its expertise. These two distinctions compel the conclusion that Tovar's due process claim fails.

Tovar also contends the Regulation is invalid on equal protection grounds. She asserts that the Regulation ought to receive strict scrutiny from this court. This is clearly wrong, because only state laws that discriminate among groups of aliens receive such high scrutiny. *Mathews v. Diaz,* 426 U.S. 67, 84–85, 96 S.Ct. 1883, 1893–94, 48 L.Ed.2d 478 (1976).

Although the federal government's power to discriminate against aliens is broad, it cannot subject all aliens or any group of aliens to invidious discrimination. *See id.* at 77, 96 S.Ct. at 1890; *Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982). Here, the limited burden imposed on temporary resident aliens is not "invidious." Tovar must show that the Regulation is "wholly irrational." *See Mathews,* 426 U.S. at 82–83, 96 S.Ct. at 1893; *Mow Sun Wong v. Campbell,* 626 F.2d 739, 744 (9th Cir.1980), *cert. denied sub nom. Lum v. Campbell,* 450 U.S. 959, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981); *cf. Price v. INS,* 962 F.2d 836, 842 n. 6 (9th Cir.1992) ("an alien is 'accorded a generous and ascending scale of rights as he increases his identity with our society,'" quoting *Johnson v. Eisentrager,* 339 U.S.

---

**6.** The Civil Service Commission's failure to advance an interest that was properly within its jurisdiction was essential to the Court's conclusion in *Hampton* that the exclusionary regulation denied all aliens due process. 426 U.S. at 116, 96 S.Ct. at 1911. The Court determined that the "only concern of the Civil Service Commission is the promotion of an efficient federal service." *Id.* at 114, 96 S.Ct. at 1910. The reasons offered by the Civil Service Commission to support its all-alien hiring ban focused on national security

concerns. *Id.* at 104, 96 S.Ct. at 1905. "The Court held that due process required that there be a legitimate basis for presuming that the rule was actually intended to serve the Government's asserted interest." *Yassini v. Crosland,* 618 F.2d 1356, 1362 (9th Cir.1980) (per curiam). Because of the tenuous link between the asserted national security interests advanced by the *Hampton* regulation and an efficient civil service, the basis for that regulation was not legitimate.

763, 771, 70 S.Ct. 936, 940, 94 L.Ed. 1255 (1950)).

Tovar has presented no evidence that the Regulation is irrational. Moreover, the Regulation *is* rational. It is the Postal Service's response to a policy choice made by Congress. The immigration laws impose burdens on employers who hire temporary resident aliens. These laws can reduce an employer's efficiency. Congress did not want these burdens to cause employers to refuse to hire temporary resident aliens, so it enacted an anti-discrimination provision as part of IRCA. But Congress exempted itself and other federal employers from this restriction on discrimination. This allowed the Postal Service to adopt the Regulation banning the hiring of temporary resident aliens, which it adopted as a means of increasing its efficiency.

The Regulation may not be the best way for the Postal Service to deal with temporary resident aliens. It is, however, a rational means of promoting administrative efficiency, and that is where our analysis must end.

I would affirm the ALJ's grant of summary judgment in favor of the Postal Service.

